IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 18-cv-02310-RBJ

WILLIAM T. HARRIS III,

      Plaintiff,

v.

FALCON SCHOOL DISTRICT 49, a political subdivision of the State of Colorado,
SEAN DORSEY,
JARED FELICE,
PAUL ANDERSEN,
ROBERT HAWKINS,
COLORADO HIGH SCHOOL ACTIVITIES ASSOCIATION, and
PAUL ANGELICO,

      Defendants.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      This matter is before the Court on defendant Colorado High School Activities Association ("CHSAA")'s motion for summary judgment. ECF No. 67. For the reasons stated herein, the motion is DENIED.

## I. BACKGROUND

      This case arises out of Falcon School District 49 ("District 49")'s employment of plaintiff William T. Harris III as an assistant basketball coach. Mr. Harris is black and claims that he was terminated on account of his race.

### A. **CHSAA**

      CHSAA regulates high school athletics in Colorado. ECF No. 67-1 at 22. Its members are public and private high schools in Colorado. *Id.* at 24. CHSAA "administrate[s],

interpret[s], and seek[s] compliance with the CHSAA Bylaws." *Id.* at 22.

Among other things, the CHSAA bylaws govern student eligibility to compete in varsity interscholastic competitions. ECF No. 67 ¶ 3; ECF No. 77 ¶ D3. Bylaw Article 18, the "transfer rule," governs student athletic eligibility after transferring from one high school to another. ECF No. 67-1 at 64. Generally, a student who transfers high schools during the school year is ineligible for varsity competition at the receiving school for the remainder of the school year in all sports in which the student participated during the preceding twelve months. *Id.* at 66. However, a "bona fide family move to a residence that requires a transfer" permits full transfer eligibility. *Id.* at 62. A change in guardianship that requires a transfer, such as a move from a student's parents' house to his grandparents' house, is not considered a bona fide family move. *Id.* at 64.

Further, any student who transfers during the school year and whose transfer is "substantially motivated by athletic considerations" is ineligible for varsity competition for a full twelve months. *Id*. at 66. Athletic considerations include transferring to "follow the coach." *Id.* at 63. Specifically:

> If a student transfers to a school where his/her previous coach is a coach of the current school team, that move will be deemed motivated by athletic consideration. Under provision of this rule, the coach may be a former school coach or a non-school coach.
>
> As used in this Rule, the term "coach" includes any person who coaches, volunteers (regardless of compensation) or assists in any capacity with the coaching or training of the school or non-school team.

*Id*. The bylaws emphasize that "no personal relationship or one-on-one/group coaching or individual contact is required for application of this rule. If a coach has any standing with the outside team/organization/business, that coach is considered a coach of that non-school sports team." *Id.* at 67.

Transfer students seeking eligibility under the bona-fide-family-move exception must provide paperwork to CHSAA. *Id.* at 63. When a student athlete seeks waiver of the CHSAA transfer rules due to hardship, a written waiver application is sent to CHSAA for approval. ECF No. 84-3 at 69. The applicant has the burden of proof and *"the commissioner or his/her designee may conduct additional investigations as he/she deems necessary." Id.*

The Commissioner may "place on restriction . . . any member school program and/or coach" who violates certain rules, including the "[i]ntentional playing of [an] ineligible player . . . in an interscholastic scrimmage or contest." ECF No. 77-1 at 95. Placing on restriction means that the team and/or individuals involved may not participate in district, regional, or state-level qualifying athletic events including state playoff and state championship games. *Id.* at 99.

At the relevant time, Paul Angelico was the Commissioner and Chief Administrative Officer of CHSAA. ECF No. 67-2 at 10:8–17. At the relevant time, Bert Borgmann was the Assistant Commissioner with particular responsibility for boys' basketball. ECF No. 67-3 at 10:8–21. Mr. Angelico and Mr. Borgmann both testified that CHSAA is a self-policing organization and not an investigative body, wherein the member schools and coaches are responsible for knowing the bylaws and self-reporting any violations. ECF No. 67-2 at 190:9–18; ECF No. 67-3 at 18:5–14, 173:21–174:8. The bylaws provide that coaches and directors of athletics "shall be responsible for the contents of the CHSAA Constitution and Bylaws." ECF No. 67-1 at 45.

### B.  <u>The Transfer</u>

Sand Creek High School ("Sand Creek") is a school within District 49 and a member of CHSAA. ECF No. 67 ¶ 2; ECF No. 77 at 12. In early 2016, Sand Creek Athletic Director Jared

Felice approached Mr. Harris to be the Head Coach for the Sand Creek boys' basketball team ("the team") for the 2016–17 season.  ECF No. 67 ¶ 7; ECF No. 77 at 12.  Mr. Harris declined but was interested in the Assistant Coach position.  ECF No. 67 ¶ 7; ECF No. 77 at 12.  He filled out an online application on April 6, 2016, and on November 18, 2016 Mr. Felice hired Mr. Harris as Assistant Coach.  ECF No. 67 ¶ 7; ECF No. 77 at 12.  Mr. Harris signed an employment agreement in which he agreed to abide by the CHSAA Bylaws.  ECF No. 67 ¶ 8; ECF No. 77 at D8.  Mr. Harris recommended Robert Hawkins for the Head Coach position, and Sand Creek ultimately hired Mr. Hawkins to be Head Coach.  ECF No. 67 ¶ 7; ECF No. 77 at 12.

The Sand Creek team was strong during the 2016–17 season and was considered a potential championship contender.  ECF No. 77-8 at 113:12–19.  Mr. Hawkins testified that on December 16, 2016, in the middle of the season, a student player ("DS") told him that his best friend ("RM"), a high school senior at another school, wanted to transfer to Sand Creek and play on the team.  ECF No. 77-9 at 37:6–38:7.  RM was a "well-known high school basketball player, whose transfer status would spark controversy at the mid-year point."  ECF No. 77-16 at DISTRICT49_0000174.  RM's parents were moving to Montana, and RM was moving in with his grandmother.  ECF No. 77-7 at 88:15–98:4.

Mr. Hawkins spoke to Mr. Felice about RM, and Mr. Felice indicated that he had already spoken to RM's father about the transfer.  ECF No. 77-9 at 37:6–38:7.  On December 19, 2016 Mr. Felice called Mr. Angelico about RM.  ECF No. 67-2 at 156:6–158:9.  From the information that Mr. Felice provided, it appeared to Mr. Angelico that RM could become eligible at Sand Creek under the bona-fide-family-move exception to the transfer rule.  *Id.* at 157:13–160:18.  Even if it turned out that he was not eligible, CHSAA rules permit students to participate in team practices and non-varsity competitions.  ECF No. 67-1 at 64–65.  As such, Mr. Angelico told Mr.

Felice that RM could practice with the team before the official paperwork was submitted and approved. ECF No. 67-2 at 70:23; ECF No. 67-3 at 96:13–25, 104:5–9.

However, Mr. Felice interpreted Mr. Angelico's consent for RM to practice with the team as consent to the transfer and clearance for RM to play in varsity basketball games upon enrollment at Sand Creek. ECF No. 77-7 at 13:6–14. On approximately December 16, 2016 Mr. Hawkins informed Mr. Harris that RM would be joining the team. ECF No. 77-10 at 52:4–22. Mr. Harris responded that he did not want RM to join the team. *Id.* at 52:4–53:12; ECF No. 9 at 47:17–23. He felt it was unfair to the other players. ECF No. 77-10 at 61:12–19. During practice Mr. Harris refused to speak to or coach RM. *Id.* at 69:8–12.

On January 2, 2017 RM participated in a varsity game before the required paperwork had been submitted or approved. ECF No. 67-6 at 19:14–20:19; ECF No. 67-3 at 81:25–82:11, 99:14–20. Mr. Hawkins alone made the decision to play RM in the game, although Mr. Harris did not indicate that he did not want RM to play in the game. ECF No. 77-9 at 49:1–23. On January 2, 2017 CHSAA began receiving complaints from the Colorado Springs community about RM's participation in the game. ECF No. 77-2 at 33:5–24; ECF No. 77-3 at 161:12–162:8.

On January 3, 2017 Mr. Felice called Mr. Angelico "to seek possibly more guidance/support due to various people questioning why [RM] was playing." ECF No. 77-16 at DISTRICT49_0000177. Mr. Felice alleges that Mr. Angelico "gave [Mr. Felice] a new directive" by indicating that RM's transfer did not fall under the bona-fide-family-move exception after all. *Id.* at DISTRICT49_0000175. Rather, the transfer-of-guardianship rule—which requires different procedures and results in different eligibility determinations—applied. *Id*. Mr. Angelico later clarified that he did not provide Mr. Felice with a "new directive" because

he had never provided Mr. Felice with a definitive determination to begin with.  ECF No. 84-6 at 233:24–234:16.

The following day, on January 4, 2017, Mr. Felice emailed a narrative of RM's transfer to Sand Creek Zone Superintendent Sean Dorsey.  ECF No. 77-16.  In that narrative, Mr. Felice explained that "[i]t was [his] understanding from the [December 19] conversation with Mr. Angelico that this was a bona fide move," and that after proceeding with the requisite bona-fide-family-move transfer paperwork he had "informed [the] head boys basketball coach, Rob Hawkins, that [RM] had been cleared to play."  *Id.* at DISTRICT49_0000174–75.

Also, on January 4, 2017, Mr. Borgmann sought information about RM's transfer from Andy Parks, the Athletic Director of RM's former school.  ECF No. 77-15; ECF No. 84-9 at 38:18–40:2.  Mr. Borgmann told Mr. Parks: "I passed on everything [to Mr. Angelico] and he and I are working on this together now. . . .  You can continue to provide information to me."  ECF No. 77-15.  During this time Mr. Borgmann also spoke with Chris Noll, an athletic director of another school.  ECF No. 77-2 at 85:14–16.

On January 6, 2017 Mr. Angelico admitted in an email to Mr. Felice that in the December 19 conversation he had "impl[ied] that this sounded like a bona fide move and one that would probably just need to go to the automatic file . . . to be passed," and that he had made a mistake in "answering the question of eligibility" before the paperwork was submitted.  ECF No. 77-14 at 1.  He also stated: "As a result I have to take the responsibility for allowing this student to play prior to his eligibility check.  *Id.*  He told Mr. Felice that if RM were ultimately found ineligible, "it will be up to you if you chose [sic] to forfeit the January 2nd game.  There will be no pressure or ramification if you chose [sic] not to do so."  *Id.*  In his affidavit, Mr. Angelico clarified: "I felt I should take responsibility for the mistake by Sand Creek and Mr. Felice."  ECF No. 67-10

¶ 8.

On January 10, 2017 Mr. Felice asked to speak with Mr. Angelico about "the suspicious recruiting allegations against" Mr. Harris.  ECF No. 77-17.  In 2011, prior to his employment with Sand Creek, Mr. Harris had founded PLUTO Basketball, a youth basketball program designed to train and condition student players.  ECF No. 77-10 at 10:10–25.  That same day, on January 10, Mr. Felice showed Mr. Harris a photo of RM at PLUTO Basketball and told Mr. Harris that "[t]his is a big problem."  *Id.* at 106:9–109:6.  Mr. Harris responded that the photo was from 2014.  ECF No. 77-7 at 51:15–52:10.  Mr. Felice was concerned that because Mr. Harris had previously trained RM, RM's mid-year transfer and addition to the team violated the follow-the-coach rule.  ECF No. 67-6 at 47:8–48:10.

This appears to be the first time in the record that any Sand Creek or CHSAA employees expressly discussed Mr. Harris' alleged violation.  However, Mr. Felice testified that "we all know Mr. Harris works as a basketball trainer in the community," and that there were "members of the community" who "thought that [Mr. Harris] was recruiting a lot of kids" based on his position as a trainer.  ECF No. 67-6 at 37:1–39:5.  Mr. Felice further testified that such rumors were "nonstop every day for pretty much that entire month of January."  *Id.*

At unspecified times, Mr. Borgmann testified that he had several phone conversations with Mr. Felice.  ECF No. 77-2 at 131:4–16.  Of those, "at least two [were] additional phone calls of [Mr. Felice] calling asking for clarifications on some of the bylaws," including the follow-the-coach rule, and "the others were conversations that he had that he was working with his administration to put together the [self-] reporting letter and . . . the corrective action letter."  *Id.*  At some point Mr. Borgmann also viewed Mr. Harris' PLUTO Basketball website.  *Id.* at

121:15–122:7.

On January 11, 2017 Mr. Felice submitted Sand Creek's "self-report" letter to CHSAA regarding "several very possible CHSAA by-law violations."  ECF No. 77-18.  The letter concerned only Mr. Harris' alleged violations and did not mention the conduct of any other individuals.  *Id*.  The letter accused Mr. Harris of (1) recruiting RM after training him at PLUTO Basketball and (2) holding practices on a blackout day, i.e. a day when no teams were allowed to practice.  *Id*.  Mr. Felice ended the letter by stating: "I am of the belief that violations have occurred.  Naturally, I will implement any directives that may follow your investigation of these matters."  *Id*.

The following day, on January 12, 2017, Mr. Borgmann sent Mr. Felice a response letter placing the team, Mr. Hawkins, and Mr. Harris on restriction with CHSAA.  ECF No. 77-19.  The letter stated that this penalty was for violating Article 1800.3(d) of the CHSAA Bylaws by "playing a transfer student who had followed his coach."  *Id*.  This penalty meant that the team would not be able to play in the playoffs.  ECF No. 77-8 at 166:25–167:4.  The letter also invited Sand Creek to propose "corrective action" sufficient to allow CHSAA to grant a temporary waiver of the restriction so that the team and the coaches could participate in the pending post-season basketball competitions.  ECF No. 77-19.

The record as presented by the briefs does not clarify when Mr. Harris was expressly informed that he had been placed on restriction.  Mr. Harris was never provided with the CHSAA letter.  ECF No. 77-10 at 77:10–14, 173:1–22.  During a chance encounter in a hallway, Mr. Felice told Mr. Harris that Mr. Harris could not attend practices and should not attend games "just in case a crazy fan or somebody want[ed] to hurt" him.  *Id.* at 174:20–22.

Mr. Harris testified that Mr. Hawkins and Mr. Felice both told him that he should "call

the NAACP," and that CHSAA was targeting him because he is black.  *Id*. at 197:6–198:11.  Mr. Felice denies that he told Mr. Harris to call the NAACP.  ECF No. 77-7 at 232:7–10.  Mr. Hawkins testified that he did not remember if he specifically mentioned the NAACP, but confirmed that he told Mr. Harris to call "whoever . . . could help him in this realm" because "at the time the amount of information [he] . . . was given . . . [was] that this has only happened to black coaches."  ECF No. 77-9 at 101:19–102:18.  He also testified that "the District conveyed to [him] that they were supporting [Mr. Harris], that they . . . were basically in a battle with CHSAA over this," and that Mr. Felice had "agreed that [Mr. Harris] had done nothing" and the situation "wasn't fair."  *Id.* at 73:1–23.  However, "[b]ased on what [he] know[s] now," Mr. Hawkins no longer thinks that there was racism involved.  *Id*.  It is not clear what additional information Mr. Hawkins learned that changed his mind.

On January 16, 2017 Mr. Hawkins wrote a letter to CHSAA accepting fault for the transfer violation.  ECF No. 77-20; ECF No. 84-6 at 196:6–197:21.  The letter asserted that, "pending the conclusion of the investigation," Mr. Harris had been removed from practice and had sat out of two games, and RM had been removed from the team.  ECF No. 77-20.

### C.  <u>The Termination</u>

On January 20, 2017 Mr. Felice sent CHSAA two letters.  ECF Nos. 77-21, 77-22.  The first letter stated that "[i]n order to remove the restriction" and take "corrective action," Sand Creek forfeited the January 2 game, removed RM from the team, implemented new CHSAA procedures and training on CHSAA bylaws, and terminated Mr. Harris' employment.  ECF No. 77-21.  Mr. Angelico testified that this letter was the first time he learned that District 49 was terminating Mr. Harris.  ECF No. 67-2 at 267:15–268:8.  The second letter provided: "Per your request, are [sic] my investigative findings concerning the relationship" between Mr. Harris and

RM.  ECF No. 77-22 at CHSAA 0007.

Mr. Felice testified that the decision to terminate Mr. Harris was jointly made by Mr. Dorsey, District 49's Director of Human Resources Paul Andersen, and District Superintendent Mr. Hilts.  ECF No. 67-6 at 59:25–60:18.  He further testified that neither Mr. Angelico nor anyone else at CHSAA directed anyone to terminate Mr. Harris.  *Id*.  Mr. Dorsey also testified that he made the final decision with support from Mr. Felice, Mr. Andersen, and Mr. Hilts, and with no input from CHSAA.  ECF No. 67-7 at 38:16–39:15, 41:22–43:3, 45:7–22.

Mr. Dorsey and Mr. Felice both testified that they made the decision because they believed it was necessary to obtain a temporary waiver of the restriction from CHSAA so that the team and/or coaches could participate in post-season basketball competition, and that there was no consideration of race.  ECF No. 67-6 at 56:10–57:1, 60:19–25, 64:4–14, 214:6–12; 220:12–221:3, 223:3–224:2; ECF No. 67-7 at 43:11–44:18, 45:25–46:5, 68:24–69:12, 96:20–97:13.  Mr. Dorsey testified that he chose to terminate Mr. Harris but not Mr. Hawkins because Mr. Harris was the only one with a "prior relationship" with RM.  ECF No. 67-7 at 95:25–97:2.

Mr. Dorsey terminated Mr. Harris in a meeting on January 27, 2017.  ECF No. 77-8 at 166:3–167:13.  During that meeting, Mr. Dorsey told Mr. Harris: "[H]ere's the one thing that's unfortunate, in my opinion, is that CHSAA has used that evidence of the . . . camp . . . on the Pluto website . . . . [a]s the evidence to put Sand Creek on restriction."  ECF No. 77-8 at 166:3–171:25.  Mr. Andersen, who was also present at the meeting, added: "[CHSAA is] set in their interpretation of what happened . . . they're just not willing to talk about it. . . .  [T]hey have communicated what we need to do to get off restriction. . . .  [W]e didn't interpret what happened as you recruiting, but CHSAA has; and, you know, they are the authority in this matter."  *Id*.  Mr. Andersen noted that he had not personally spoken to anyone at CHSAA.  *Id*. at 170:6–9.  Mr.

Dorsey later testified that he "could have been nervous" during this meeting because he did not "like to fire anybody." *Id.* at 172:23–173:2, 177:2–3.

The parties dispute at what point Mr. Angelico and Mr. Borgmann learned of Mr. Harris' race. At the time Mr. Harris was terminated, neither Mr. Angelico nor Mr. Borgmann had met Mr. Harris. ECF No. 67-2 at 131:5–18; ECF No. 67-3 at 127:5–10. Mr. Angelico and Mr. Borgmann both testified that they did not learn Mr. Harris' race until January 20, 2017 "at the earliest," upon receiving Mr. Felice's letter that included the photo of RM and Mr. Harris at PLUTO Basketball. ECF No. 67-10 ¶ 10; ECF No. 67-14 ¶¶ 9–10. However, Mr. Angelico also testified that he had first received the photo some time before January 10, 2017. ECF No. 77-3 at 218:7–220:11.

On January 30, 2017, Mr. Borgmann emailed Mr. Felice confirming that the team and Mr. Hawkins would be removed from restriction beginning February 13, 2017. ECF No. 77-23.

### D. Procedural History

On September 10, 2018 Mr. Harris filed a complaint with this Court. ECF No. 1. He filed an amended complaint on January 17, 2019 against CHSAA, Mr. Angelico, District 49, Mr. Felice, Mr. Hawkins, Mr. Dorsey, and Mr. Andersen. ECF No. 15. The complaint alleged four claims against the various defendants. On September 23, 2019 Mr. Harris settled with and stipulated dismissal of District 49, Mr. Felice, Mr. Hawkins, Mr. Dorsey, and Mr. Andersen. ECF No. 56. On February 18, 2020 Mr. Harris voluntarily dismissed Mr. Angelico. ECF No. 66.

There are two remaining claims against sole defendant CHSAA: (1) discriminatory treatment because of race in violation of 42 U.S.C. § 1981; and (2) aiding and abetting race discrimination in violation of the Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. §

24-34-402(1)(e)(I).  ECF No. 14 ¶¶ 137–48.

On February 21, 2020 CHSAA filed the instant motion seeking summary judgment on both claims.  ECF No. 67.  Regarding the § 1981 claim, CHSAA argues that it had no contractual relationship with Mr. Harris, and that Mr. Harris cannot prove intentional discrimination.  Regarding the CADA claim, CHSAA argues that there was no underlying discrimination, and that even if there was, CHSAA lacked sufficient intent to discriminate or knowledge of the discrimination.

## II.  STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Section 1981 Claim

42 U.S.C. § 1981 provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  As such, § 1981 prohibits racial discrimination in the making and enforcement of contracts.  *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004).  CHSAA argues that it is entitled to summary judgment on Mr. Harris' § 1981 claim because (1) Mr. Harris has not shown that there was any contractual relationship between himself and CHSAA and (2) Mr. Harris has not shown that CHSAA intended to discriminate on the basis of race.  ECF No. 67 at 12.

#### 1.  Contractual Relationship

CHSAA argues that Mr. Harris' failure to allege any contractual relationship between himself and CHSAA is fatal to his § 1981 claim.  ECF No. 67 at 16.  CHSAA cites Tenth Circuit case law stating that § 1981 requires "an actual loss of a contract interest," *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101 n.1 (10th Cir. 2001), and must "be supported by an underlying right of the employee to 'make and enforce contracts,'" *Perry v. Woodward*, 199 F.3d 1126, 1132 (10th Cir. 1999).  Because there is no contract between Mr. Harris and CHSAA, CHSAA argues that Mr. Harris' § 1981 claim fails.

Yet contractual privity between the plaintiff and the defendant is not required.  In *Harris v. Allstate Insurance Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002), the Tenth Circuit found that "[r]elief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party."  Such relief "requires the individual to show that the party both possessed sufficient authority to significantly interfere with the

individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment." *Id*.

Mr. Harris states that his at-will employment constitutes a contractual relationship within the meaning of § 1981, and thus CHSAA is liable "for its discriminatory interference with Harris' contractual employment relationship with the District." ECF No. 77 at 16; *see also Perry*, 199 F.3d at 1132–34 (finding "that the employment at-will relationship encompasses sufficient contractual rights to support section 1981 claims for wrongful termination"). Mr. Harris also argues that there are material factual disputes as to which entity—CHSAA or the District—made the termination decision. ECF No. 77 at 21.

I agree that there are material factual disputes as to both whether CHSAA possessed sufficient authority to significantly interfere with Mr. Harris' contract with District 49 and whether CHSAA actually exercised that authority to Mr. Harris' detriment. It is true that CHSAA has provided various deposition testimony from both CHSAA employees and District 49 employees asserting that the decision to terminate was made jointly and solely by Mr. Dorsey, Mr. Andersen, and Mr. Hilts, without any input from CHSAA. Yet Mr. Harris has provided evidence that during his termination meeting, Mr. Dorsey and Mr. Andersen indicated that CHSAA was "set in their interpretation of what happened" and that District 49 "didn't interpret what happened to [Mr. Harris] as [him] recruiting, but CHSAA has; and . . . they are the authority in this matter." ECF No. 77-8 at 170:6–9. Whether Mr. Dorsey merely misspoke due to being "nervous" because he did not "like to fire anybody" is for a fact-finder to decide. *Id.* at 172:23–173:2, 177:2–3.

Mr. Harris has also provided evidence that CHSAA did its own investigation, although CHSAA denies this allegation. CHSAA has the authority to investigate in at least some

circumstances.  The bylaws provide that students seeking a hardship waiver from the transfer rules must get approval from CHSAA, and that CHSAA may conduct "further investigation as . . . necessary."  Mr. Borgmann had several conversations with Mr. Felice prior to the self-report letter that included discussion of the bylaws, Mr. Harris, the self-report letter, and the corrective action letter.  Mr. Borgmann spoke with the athletic directors of other schools about the transfer issue and looked up Mr. Harris' PLUTO Basketball website.

I find CHSAA's cited case of *Babi v. Colorado High School Activities Association*, 77 P.3d 916 (Colo. App. 2003), does not apply here.  In *Babi*, the Colorado Court of Appeals held that CHSAA was not the ultimate decision-maker where CHSAA gave the school administration a choice between suspending the wrestling coach or restricting the team.  *See id.* at 920.  In contrast, here Mr. Harris has presented evidence that CHSAA itself made the decision to terminate him, rather than presenting two options for the District to decide between.

I find that contractual privity is not required for § 1981 claims, and that Mr. Harris has presented genuine disputes of material fact regarding whether CHSAA discriminatorily used its authority to interfere with his contractual employment with District 49.

### 2.   Intentional Discrimination

CHSAA argues that Mr. Harris has failed to prove intentional discrimination on CHSAA's part.  Only intentional racial discrimination violates §1981.  *See Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994).  "It is well settled that a plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence, employing the burden-shifting framework first articulated in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973)."  *Perry*, 199 F.3d at 1134.

Mr. Harris apparently concedes that there is no direct evidence of intentional discrimination, instead relying on indirect evidence.  ECF No. 77 at 17.  To show indirect evidence of intentional discrimination under § 1981 using the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence.  *See Perry*, 199 F.3d at 1135.  If the plaintiff successfully establishes a prima facie case, the defendant then has the burden of articulating a legitimate, nondiscriminatory reason for the interference.  *See id*.  Should the defendant do so, the burden switches back to the plaintiff to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual.  *See id*.

### a.   Prima Facie Case

To establish a prima facie case of intentional discrimination, a plaintiff may show that (1) he is a member of a protected class, (2) the defendant intended to discriminate on the basis of that protected class, and (3) the discrimination interfered with a protected activity as defined in § 1981, including the making or performance of a contract.  *See Hampton*, 247 F.3d at 1101–02 (emphasizing that these elements "are flexible and are not to be applied rigidly" (quoting *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 n.2 (10th Cir. 1994))).  CHSAA argues that Mr. Harris cannot meet his prima facie burden because he has not shown that CHSAA intended to discriminate against him.

Intentional racial discrimination "can be inferred from the mere fact of differences in treatment" when a black plaintiff shows that he was treated differently than similarly situated white individuals.  *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir. 1988).  Individuals are considered "similarly situated" when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have

engaged in conduct of "comparable seriousness." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (defining "similarly situated"); *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (using the "similarly situated" definition in the § 1981 context). Mr. Harris asserts that he was treated differently than both Mr. Hawkins, Sand Creek's white head coach, and Mr. Felice, Sand Creek's white athletic director. ECF No. 77 at 17–19.

I cannot find that Mr. Harris and Mr. Felice, the athletic director, are similarly situated. They do not report to the same supervisor, and Mr. Harris has not presented any evidence regarding whether he and Mr. Felice are subject to the same performance standards.

However, I do find that Mr. Harris and Mr. Hawkins, the head coach, are similarly situated. Both were hired by and supervised by Mr. Felice. Both engaged in the same conduct of coaching and playing a student who had violated CHSAA's transfer bylaws. It appears that both were subject to the same standards, as evidenced by the fact that Mr. Dorsey's only stated reason for deciding to terminate Mr. Harris but not Mr. Hawkins was Mr. Harris' "prior relationship" with RM, not that the assistant coach and head coach are held to different standards. ECF No. 67-7 at 95:25–97:2. Indeed, whereas Mr. Harris was ultimately terminated, it appears that no one ever even considered terminating Mr. Hawkins.

CHSAA argues that the court cannot infer intentional discrimination on CHSAA's part because it had no role in Mr. Harris' alleged differential treatment. It presents testimony from District 49 employees and CHSAA employees that CHSAA had no role in deciding to terminate Mr. Harris. It also notes that it placed both Mr. Harris and Mr. Hawkins on restriction for violation of the bylaws. Mr. Angelico and Mr. Borgmann both testified that neither of them even learned of Mr. Harris' race until at least January 20, 2017, when they received Mr. Felice's letter

that stated his intent to terminate Mr. Harris and included the photo of RM and Mr. Harris at PLUTO Basketball.

Yet for the same reasons as discussed above, there remains a genuine dispute of material fact as to what role CHSAA played in the termination decision. CHSAA has the authority to investigate in at least some circumstances. Mr. Harris has provided evidence that CHSAA did its own investigation, including the statements made during his termination; Mr. Angelico's conversations with Mr. Felice; Mr. Borgmann's conversations with Mr. Felice; Mr. Borgmann's conversations with other athletic directors; and Mr. Borgmann's viewing of Mr. Harris' PLUTO Basketball website. In particular, Mr. Felice discussed Mr. Harris, the self-report letter, and the corrective action letter with Mr. Borgmann prior to issuing those letters.

There is also a dispute regarding when Mr. Angelico and Mr. Borgmann learned of Mr. Harris' race. Despite their testimony that they did not learn of Mr. Harris' race until at least January 20, 2017, Angelico testified that he first received the photo of Mr. Harris some time before January 10, 2017, ten days before Mr. Felice's letter stating his intent to terminate Mr. Harris. Based on the existence of disputed material facts, I find that Mr. Harris has met his prima facie burden of showing intentional racial discrimination through differential treatment.

### b. Legitimate, Nondiscriminatory Reason

CHSAA argues that the legitimate, nondiscriminatory reason for District 49's decision to terminate Mr. Harris but not Mr. Hawkins was that Mr. Harris was the one with the "prior relationship" with RM and therefore caused the violation of CHSAA's follow-the-coach rule. ECF No. 67-7 at 95:25–97:2. As CHSAA explains, Mr. Harris "was the coach who had previously trained the student athlete, and therefore was 'followed.'" ECF No. 67 at 13. CHSAA presents further testimony that District 49 chose to terminate Mr. Harris, rather than

discipline him more lightly, in order to lift the Sand Creek team from restriction so that it could be eligible for the post-season playoffs.  I find that this constitutes a legitimate nondiscriminatory reason for terminating Mr. Harris.

### c.  Pretext

In considering pretext, this Court's "role isn't to ask whether the employer's decision was 'wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs.'"  *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)) (alternations in original).  Mr. Harris argues that CHSAA's alleged reasons are mere pretext for intentional race discrimination for two reasons.  ECF No. 77 at 19.

First, Mr. Harris argues that the rule that CHSAA alleges he violated "did not exist at the time" that he was alleged to have violated it.  ECF No. 77 at 19.  Pretext can be shown where an employee gives post hoc justifications for an adverse employment decision or argues that it relied on a policy that did not exist until after the adverse employment decision.  *See Plotke v. White*, 405 F.3d 1092, 1103 (10th Cir. 2005); *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008).  Specifically, Mr. Harris takes issue with several ways in which the CHSAA interpreted its bylaws as applied to him.

Mr. Borgmann's January 12, 2017 letter placed the team, Mr. Hawkins, and Mr. Harris on restriction for violating Article 1800.3(d) of the CHSAA Bylaws by "playing a transfer student that had followed his outside coach."  ECF No. 77-19.  Mr. Harris argues that CHSAA mistakenly "applied [Article 1800.3(d)] against the coaches and [the team]—not against the player as the rule indicates."  ECF No. 77 § P37.  It is true that the bylaws' transfer rules appear

to govern the athletic eligibility and conduct of individual students rather than coaches or teams. ECF No. 67-1 at 64. Yet Article 2330, "Penalty for Practice, Scrimmage, Competition Violations," expressly allows CHSAA to "place on restriction . . . any member school program and/or coach" who violates certain rules, including the "[i]ntentional playing of [an] ineligible player . . . in an interscholastic scrimmage or contest." *Id.* at 95. Thus Mr. Harris is incorrect that the bylaws do not contemplate punishing coaches for violations of the follow-the-coach rule.

Mr. Harris also argues that the bylaws "do not clearly indicate that trainers, like Harris, who coach individuals and not teams are considered coaches of 'non-school teams' for purposes of the rule." ECF No. 77 § P37. The follow-the-coach rule defines "coach" to include "any person who coaches, volunteers . . . or assists in any capacity with the coaching or training of the *school or non-school team*." ECF No. 67-1 at 63 (emphasis added). Mr. Harris argues that because he trained RM as an individual, not as part of a larger team, that training does not fall under the follow-the-coach rule.

Mr. Harris may be correct that the follow-the-coach rule was never meant to apply to coaches of individuals. But this is not evidence of post hoc justification. The relevant bylaws were published in the CHSAA Handbook for the 2016–17 school year, prior to Mr. Harris' employment with District 49. CHSAA did not create a new rule to justify its treatment of Mr. Harris. If anything, it is evidence of a misapplication of the bylaws. Although misapplication of policies can also be evidence of pretext, this Court's role is merely to determine whether such misapplication was done in bad faith. Mr. Harris does not clarify what the difference is between training individuals at a basketball camp and training a non-school team at a basketball camp. Nor does that difference seem so significant as to render the application of the bylaws to Mr. Harris in bad faith. Indeed, Mr. Felice testified in deposition that when he saw the photo of RM

at PLUTO Basketball he "thought there had been a violation as the rule is written."  ECF No. 77-7 at 51:7–52:25.  I cannot find that applying these bylaws to Mr. Harris was such a misinterpretation of the bylaws as to be in bad faith.

Second, as further evidence of pretext Mr. Harris also points to contradictory statements made by District 49 employees and CHSAA employees.  The Tenth Circuit has held that:

> the relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.

*Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citing *Rivera v. City & Cty. of Denver,* 365 F.3d 912, 924–25 (10th Cir. 2004)).

Mr. Harris argues that several of the witnesses have made statements so inconsistent as to indicate pretext.  ECF No. 77 at 20.  Initially the focus of the transfer issue was the miscommunication between Mr. Angelico and Mr. Felice regarding whether RM fell under the bona-fide-family-move exception or the transfer-of-guardianship rule.  Based on that miscommunication, Mr. Felice allowed Mr. Hawkins to play RM before RM's paperwork had been submitted or approved.  Mr. Angelico formally accepted responsibility for this misunderstanding on January 6, 2017, although in deposition testimony he maintains that it was Mr. Felice's mistake.

Days later, on January 10, 2017, Mr. Felice mentions to Mr. Angelico "the suspicious recruiting allegations against" Mr. Harris.  ECF No. 77-17.  From there on out the conversation shifts entirely from the transfer-of-guardianship violation to the follow-the-coach violation.  Any consideration of fault on behalf of Mr. Angelico or Mr. Felice is dropped, and Mr. Harris is placed solely at blame.  Mr. Borgmann has several phone calls with Mr. Felice discussing the

follow-the-coach rule, the self-report letter, and the corrective action letter.  In the self-report

letter to CHSAA, Mr. Felice reports only Mr. Harris' alleged violations without mentioning the

transfer-of-guardianship violation.  Indeed, the miscommunication between Mr. Angelico and

Mr. Felice is never mentioned again by anyone despite its being the only reason that RM was

allowed to play in the first place.

The District 49 employees, including Mr. Hawkins, Mr. Felice, and Mr. Dorsey, have

also made contradictory statements about the reasons for Mr. Harris' termination.  At some point

after the self-report letter but before Mr. Harris' termination, Mr. Hawkins told Mr. Harris that

he believed CHSAA was unfairly targeting Mr. Harris due to his race.  Mr. Hawkins testified

that he no longer believes racism was involved "[b]ased on what [he] know[s] now," but he does

not clarify what additional information he learned that changed his mind.  ECF No. 77-9 at 73:1–

23.  Mr. Harris testified that Mr. Felice also told him that CHSAA was unfairly targeting him

because of his race, and that he should "call the NAACP," although Mr. Felice denies this.  ECF

No. 77-10 at 197:6–198:11; ECF No. 77-7 at 232:7–10.

As discussed, there is also confusion regarding who even made the termination decision

and what role, if any, CHSAA played in investigating the incident.  To briefly recap, during the

termination meeting Mr. Dorsey and Mr. Andersen indicated that the termination was CHSAA's

decision.  Mr. Dorsey told Mr. Harris: "CHSAA has used that evidence of the . . . camp . . . on

the Pluto website . . . . [a]s the evidence to put Sand Creek on restriction."  ECF No. 77-8 at

166:3–171:25.  Mr. Andersen added: "[CHSAA is] set in their interpretation of what happened . .

. they're just not willing to talk about it. . . .  [T]hey have communicated what we need to do to

get off restriction. . . .  [W]e didn't interpret what happened as you recruiting, but CHSAA has;

and, you know, they are the authority in this matter."  *Id*.  Yet Mr. Dorsey and Mr. Felice both

later testified that the termination decision was made solely by District 49 employees.  ECF No.

67-6 at 59:25–60:18; ECF No. 67-7 at 38:16–39:15, 41:22–43:3, 45:7–22.  Further, despite Mr.

Angelico and Mr. Borgmann's statements that CHSAA is a passive organization that relies

purely on member self-reporting, there is evidence indicating that Mr. Angelico and Mr.

Borgmann had several conversations with Mr. Felice and other athletic directors regarding the

transfer issue prior to issuance of the self-report letter.

Based on these inconsistent statements over the course of the events at issue, I find that

Mr. Harris has met his burden at summary judgment of showing that a genuine dispute of

material fact exists as to whether CHSAA's articulated reason was pretextual.  Accordingly,

CHSAA's motion for summary judgment on Mr. Harris' § 1981 claim is denied.

### B.  CADA Aiding and Abetting Claim

CADA provides an avenue for tangential liability in a few narrow contexts, including to

"aid, abet, incite, compel, or coerce the doing of a discriminatory act or unfair employment

practice."  Colo. Rev. Stat. § 24-34-402(1)(e)(I).  CHSAA argues that it is entitled to summary

judgment on Mr. Harris' CADA aiding and abetting claim for two reasons.

First, CHSAA argues there is no underlying discrimination.  ECF No. 67 at 17.  The

aiding and abetting claim is derivative of the underlying discriminatory act.  *See Heguy v.*

*Unleaded Software, Inc*., No. 17-CV-02399-STV, 2019 WL 2151305, at *12 (D. Colo. May 17,

2019) (dismissing a CADA aiding and abetting claim where there was no finding of underlying

discrimination).  Because I found that Mr. Harris stated a § 1981 claim sufficient to survive

summary judgment, he has shown sufficient underlying discrimination to support an aiding and

abetting claim under CADA.

Second, CHSAA argues that even if there is underlying discrimination, Mr. Harris has failed to demonstrate that CHSAA had sufficient knowledge of or involvement in any alleged discrimination.  ECF No. 67 at 18.  In *Colorado Civil Rights Commission v. Travelers Insurance Co.*, 759 P.2d 1358, 1369 (Colo. 1988), the Supreme Court of Colorado considered whether CADA required defendants to have intent to discriminate.  In *Travelers*, an insurance company had unwritten an "inherently discriminatory" insurance policy that covered childbirth with complications but not childbirth without complications.  *Id.* at 1370.  The court found that intent to discriminate was not necessary, noting that "[t]he conduct proscribed [by CADA] is simply conduct that assists others in their performance of prohibited acts."  *Id.* at 1369.  It held that "[w]hen the conduct being assisted is patently discriminatory, one need not have an intent to discriminate to be considered an aider or abettor."  *Id.* at 1370.  Thus, the defendant's knowledge of the discriminatory insurance policy was sufficient.  *See id.* at 1370.

CHSAA argues that the insurance policy in *Travelers* was "inherently" and "patently" discriminatory, whereas here the follow-the-coach rule and the self-reporting process are race-neutral.  ECF No. 67 at 19 (quoting *Travelers*, 759 P.2d at 1370).  CHSAA requests that this Court "not read the word 'patently' out of the [*Travelers*] holding."  ECF No. 84 at 13.  Yet I find that *Travelers* stands for two distinct propositions: (1) aiding and abetting requires only knowledge of discrimination, not intent to discriminate; and (2) knowledge may be implied where the conduct at issue is "patently" or "inherently" discriminatory.  Here, I agree with CHSAA that Mr. Harris has not shown that the conduct was so "patently" or "inherently" discriminatory as to imply CHSAA's knowledge.  But Mr. Harris need not rely on implication; he may present facial evidence of CHSAA's knowledge.

I find that Mr. Harris has presented a genuine dispute of material fact regarding CHSAA's knowledge of the alleged discrimination.  A reasonable jury could find that, based on the facts, CHSAA was aware of District 49's discrimination against Mr. Harris.  As discussed several times over, there is considerable dispute regarding the extent to which CHSAA investigated Mr. Harris, the extent to which CHSAA was involved in the termination decision, and at what point CHSAA learned of Mr. Harris' race.

Accordingly, CHSAA's motion for summary judgment on Mr. Harris' CADA aiding and abetting claim is denied.

## ORDER

Defendant's motion for summary judgment, ECF No. 67, is DENIED.

DATED this 21st day of July, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge